UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL BETENBAUGH AND DALAS L. GUNDERSEN,<br><br>Defendants. | Case No. 2:21-cv-01761-TLN-CKD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On September 27, 2021, Plaintiff Safeco Insurance Company of America ("Plaintiff") filed the Complaint in this action against Defendants Paul Betenbaugh ("Betenbaugh") and Dalas Gundersen ("Gundersen"), alleging the following: (1) a claim for declaratory relief that it had no duty to defend Betenbaugh under the Homeowners Policy; (2) a claim for declaratory relief that it had no duty to indemnify Betenbuagh under the Homeowners Policy; (3) a claim for declaratory relief that it had no duty to defend Betenbaugh under the Umbrella Policy; (4) a claim for declaratory relief that it had no duty to indemnify Betenbaugh under the Umbrella Policy; and (5) a claim for reimbursement of defense fees and expenses.  (ECF No. 1.)

On September 28, 2023, the Court partially granted Plaintiff's motion for partial summary

judgment on the first, second and fourth claims, leaving only the third and fifth claims.[1]  (ECF No. 40.)  Thereafter, the Court granted Plaintiff's request to dismiss its fifth claim without prejudice.  (ECF No. 84.)  Accordingly, the remaining claim was Plaintiff's third claim, whether Plaintiff had a duty to defend Betenbaugh under the Umbrella Policy.

The Court held a bench trial in the instant matter on October 14, 2025.  (ECF No. 89.)  Having considered the evidence presented at trial and the parties' proposed findings of fact and conclusions of law submitted after trial (ECF Nos. 95, 96) and the parties' replies (ECF Nos. 97, 98), the Court sets forth the following findings of fact and conclusions of law, in accordance with Federal Rule of Civil Procedure 52(a).[2]

## FINDINGS OF FACT

After consideration of the parties' trial briefs and the evidence submitted, the Court determines that the following facts have been established in this case:

1.      Plaintiff issued the Umbrella Policy to Betenbaugh, which includes the following insuring agreement:

**PERSONAL LIABILITY**
We will pay the ultimate net loss in excess of the retained limit that the insured is legally responsible for because of covered bodily injury, personal injury or property damage caused by an occurrence.

**DEFENSE COVERAGE**
When a claim covered by this policy is made against any insured, and such claim is not covered by the insured's underlying insurance stated in the Declarations or by any other underlying insurance available to the insured, we will, subject to the retained limits, defend any suit against any insured even if it is groundless or fraudulent. And we will investigate, negotiate and settle on behalf of the insured any claim or suit as we deem appropriate.

---

[1]      Plaintiff did not move for summary judgment as to its fifth claim.  (ECF No. 25.)

[2]      Any finding of fact that may be construed as a conclusion of law is hereby also adopted as a conclusion of law.  Likewise, any conclusion of law that may be construed as a finding of fact is hereby also adopted as a finding of fact.  *See, e.g.*, *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1016, 1019 (C.D. Cal. 2011).

(Undisputed Fact[3] ("UF") No. 53; Ex. 3 at 17.[4])

2.    The Umbrella Policy contains the following pertinent Definitions:

1.    Throughout this policy, "you" and "your" refer to:
    a.    the "named insured" shown in the Policy Declarations; and

\*\*\*

2.    "We," "us" and "our" refer to the underwriting Company as shown in the Declarations providing this insurance.

\*\*\*

3.    "Bodily injury" means bodily harm, sickness or disease including resulting required care, loss of services and death.

4.    "Business" means:
    a.    a trade, profession or occupation engaged in on a full-time, part-time or occasional basis, or
    b.    any other activity engaged in for money or other compensation other than reimbursement for expenses incurred to perform the activity.

\*\*\*

8.    "Insured"
    a.    means:
        (1) you;

\*\*\*

9.    "Occurrence" means:
    a.    an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the coverage period, in:
        (1) bodily injury; or
        (2) property damage.
    b.    an offense, committed during the coverage period, which results in personal injury.

10.    "Personal injury" means injury arising out of one or more of the following offenses:
    a.    false arrest, detention or imprisonment, or malicious prosecution;
    b.    libel, slander or defamation of character; or invasion of privacy, wrongful eviction or wrongful entry.

\*\*\*

---

[3] On July 3, 2025, the parties filed a Joint Pretrial Statement, which included stipulated undisputed facts for trial. The Cout adopted the undisputed facts and incorporated them into its Final Pretrial Order to which no party filed objections. (ECF No. 67.) UF refers to the undisputed facts in Section V of the Final Pretrial Order.

[4] "Ex." references exhibits admitted at trial.

3

13.   "Property damage" means physical injury or destruction of tangible property including loss of its use.

***

16.   "Retained Limit" means either:
a.   the limit of liability specified in the Schedule of Underlying Insurance of the Declarations for each underlying policy, plus the limit of any other underlying insurance collectible by the insured; or
b.   the amount shown under retained limit in the Declarations, as the result of an occurrence not covered by underlying policies of insurance.

17.   "Underlying insurance" means insurance policies providing the insured with primary liability coverage meeting or exceeding the required minimum limits. The types of policies and the required minimum liability limits are listed in the policy Declarations.

(Ex. 3 at 15–17.)

3.   The Umbrella Policy contains the following Exclusions:

2.   personal injury:
a.   caused by or at the direction of an insured with the knowledge that the act would violate the rights of another and would inflict personal injury;
b.   arising out of oral or written publication of material, if done by or at the direction of an insured with knowledge of its falsity; or

***

5.   bodily injury, personal injury or property damage:

***

b.   arising out of:
(1) any business pursuits or business property of any insured, except for:
(a) the business use of a private passenger automobile or owned watercraft, unless used as a public or livery conveyance.
(b) the occasional or part-time self-employed business pursuits of any insured who is under 23 years of age.
(2) the rendering of any professional service or the omission of such service by any insured.

***

i.   arising out of a criminal act or omission committed by or with the knowledge or consent of any insured, except those violations of a motor vehicle law.
j.   arising out of sexual molestation, corporal punishment, illegal discrimination, sexual harassment or physical or mental abuse.

4

(Ex. 3 at 17–20.)

4.      Prior to December 2014, Defendants were employed by Edward D. Jones & Co., L.P. ("Edward Jones"), as financial advisors in the two offices Edward Jones maintained in Glenn County, California — the Willows office was run by Gundersen, whereas the Orland office was run by Betenbaugh.  (UF No. 1.)

5.      In December 2014, Edward Jones terminated Gundersen and replaced him with Betenbaugh's friend, Lisa Rodriguez ("Rodriguez").  (UF No. 2.)

6.      Following Gundersen's termination, Edward Jones distributed Gundersen's substantial book of business to other financial advisors, including Betenbaugh and Rodriguez.  (UF No. 3.)

7.      After Gundersen's termination, Betenbaugh and Rodriguez began advertising themselves as a team and running a joint marketing campaign, which Gundersen alleged was targeted to his prior clients.  (UF No. 4.)

8.      Betenbaugh and Rodriguez became upset with Gundersen after one of Gundersen's former clients filed a complaint with Edward Jones against Rodriguez, which Betenbaugh believed Gundersen ghostwrote on behalf of the client as part of their competition against each other.  (UF No. 5.)

9.      On September 29, 2015, Gundersen filed a Complaint in the Superior Court for the County of Glenn against Does 1 through 50, Case No. 15CV01484 (the "Underlying Action"), alleging a single cause of action for Internet Impersonation (Penal Code § 528.5).  (UF No. 6.)

10.     Gundersen filed the Complaint in the Underlying Action after he became aware that an unidentified defendant had posted sexually motivated solicitations on Craigslist (the "Posts"), which contained portrayals of male genitalia.  The Posts also provided a general description of the alleged poster.  Gundersen claimed these descriptions described his general appearance.  The Posts also included Gundersen's cell phone number.  (UF No. 7; Ex. 1.)

11.     The Posts, without the graphic images, were attached as an exhibit to and

incorporated into the operative complaint in the Underlying Action at the time Plaintiff made its coverage determination. (Ex. 5.)

12.   In response to the Posts, Gundersen began receiving unsolicited text messages and phone calls on his business cellular telephone number from gay men seeking sexual encounters with Gundersen. (UF No. 8.)

13.   After speaking with one of the unsolicited callers, Gundersen determined that someone posted the Posts in the Chico, California personals/ classified section of Craigslist, using Gundersen's business cellular telephone number and general description. (UF No. 9.)

14.   Given that Gundersen was attempting to rebuild his book of business in the financial advising industry of Glenn County, Gundersen claimed he could not ignore the numerous unsolicited sexually motivated texts and phone calls that he was receiving in response to the Posts. (UF No. 10.)

15.   Upon initiation of the Underlying Action, Gundersen's counsel served subpoenas on various companies in an attempt to identify the true names of the Doe defendants. The subpoena responses led Gundersen's counsel to identify Betenbaugh as a potential poster of the Posts. (UF No. 11.)

16.   Gundersen's counsel served Betenbaugh with a deposition subpoena in the Underlying Action, and Betenbaugh informed Plaintiff about the Underlying Action. (Ex. 12 at 1–2.[5])

17.   On January 13, 2026, prior to Betenbaugh being joined as a defendant in the Underlying Action, Plaintiff took Betenbaugh's recorded statement to obtain

---

[5]   Betenbaugh argues his trial testimony is more credible and accurate than the statements in Exhibit 12, which were not made under penalty of perjury and is not the best evidence as "presumably, the actual audio recording . . . could have been played for the Court and entered into evidence at trial." (ECF No. 95 at 8.) Betenbaugh's objection, to the extent it is one, was not raised in trial briefs or at trial and thus, it is waived. Even if the Court were to consider Betenbaugh's argument, however, the Court would find Exhibit 12 is admissible for the purpose of establishing Plaintiff's knowledge at the time of its coverage decision because Exhibit 12 was contained in Plaintiff's claim file.

Betenbaugh's factual account of the incident as part of its coverage investigation and to afford Betenbaugh an opportunity to provide any facts he believed were pertinent to Plaintiff's determination of coverage.  During his recorded statement, Betenbaugh admitted that he was having a dispute with Gundersen and that he posted the Posts with Gundersen's phone number for the express purpose that people call and harass Gundersen.  (Ex. 12 at 1–2.)

18.  During his recorded statement, Betenbaugh confirmed to Plaintiff that he understood what he did was wrong but did not think that the Posts would be traced back to him.  In fact, once it was revealed that it was Betenbaugh who posted the Posts, Betenbaugh believed that he might lose his job over it.  (Ex. 12 at 2–4.)

19.  During his recorded statement, Betenbaugh explained that the reason that he had a dispute with Gundersen was that Gundersen was trying to pursue a lot of his clients.  (Ex. 12 at 6.)

20.  During this recorded statement, Betenbaugh was asked if there was anything else that Betenbaugh would like to inform Plaintiff about as part of his recorded statement, and Betenbaugh responded "no."  (Ex. 12 at 6.)

21.  During his recorded statement, Betenbaugh stated that all of his statements were true, and that he understood and consented to his statement being recorded.  (Ex. 12 at 1, 7.)

22.  Thereafter, Gundersen's counsel then took Betenbaugh's deposition, which was defended by Betenbaugh's personal counsel, Georgia Stearns, prior to Betenbaugh being joined as a defendant in the Underlying Action.  (UF No. 11.)

23.  On March 1, 2016, prior to being named as a defendant in the Underlying Action, Betenbaugh executed a declaration, under penalty of perjury, stating that he posted the Posts on the Chico, California Craigslist website, specific to that local area.  Specifically, Betenbaugh's March 1, 2016 declaration attests that Betenbaugh created an imposter email address, dg_69@gmail.com, and then posted a solicitation on Chico's local Craigslist website, which read: "Anyone looking for

7

grown up discreet fun? – m4m, call me @517-0048," while knowing this to be Gundersen's telephone number.  (UF No. 12; Ex. 13 at 2.[6])

24.  Betenbaugh's March 1, 2016 declaration states he published the Posts to "annoy" Gundersen.  (UF No. 13.)

25.  Betenbaugh's March 1, 2016 declaration attests that he attempted to post another solicitation of the same nature on Craigslist, but it was flagged as inappropriate by Craigslist and pulled down from the website.  With knowledge of the inappropriateness, Betenbaugh then reposted this solicitation and let it run for a couple of days.  (UF No. 14; Ex. 13 at 2.)

26.  Betenbaugh's March 1, 2016 declaration attests that he posted the Posts because Betenbaugh was angry that Gundersen had allegedly ghostwritten a complaint letter for one of Gundersen's former clients against Rodriguez.  (UF No. 15; Ex. 13 at 2.)

27.  Betenbaugh's March 1, 2016 declaration attests that Betenbaugh made no other attempts to harass Gundersen beyond the two sexually motivated solicitations described in the declaration.  (UF No. 16.)

28.  On August 3, 2016, Gundersen filed the Second Amended Complaint (the "SAC") in the Underlying Action, naming Betenbaugh, Rodriguez, and Edward Jones as defendants.  The SAC asserted claims including Internet Impersonation (Penal Code §§ 528.5) and Sexual Harassment in Violation of California Civil Code § 51.9.  (UF No. 22; Ex. 4.)

29.  The SAC alleged that Betenbaugh developed the plan to attack Gundersen by posting the Posts after he learned that Gundersen had allegedly authored a complaint against Rodriguez.  (Ex. 4 at 9.)

[6]    Betenbaugh argues nothing in the record indicates when and/or how Plaintiff received Exhibit 13.  (ECF No. 95 at 6.)  Betenbaugh's argument was not raised in trial briefs or at trial and thus, the Court disregards it.  Even if the Court were to consider Betenbaugh's argument, however, the Court would find Plaintiff established that its claim file contained Exhibit 13, and it was available to Plaintiff at the time of its coverage determination.  (ECF No. 85-7 at 4.)

30. The SAC alleged that Betenbaugh was fired by Edward Jones in late February, after Betenbaugh admitted his conduct to Gundersen's attorney. (Ex. 4 at 11.)

31. The SAC alleged that Betenbaugh "egregiously attacked [Gundersen] using sex, sexuality, and sexual orientation as a weapon against [Gundersen]" by "impersonating [Gundersen] and soliciting other men to contact [Gundersen] for sexual encounters." (Ex. 4 at 7.)

32. The SAC alleged that Betenbaugh knowingly impersonated Gundersen, without consent, by posting the Posts and suggesting they had been posted by Gundersen, and, further, that Betenbaugh intended his conduct to cause injury to Gundersen. (Ex. 4 at 12.)

33. The SAC specifically alleged that Betenbaugh repeatedly sexually harassed Gundersen by posting the Posts. The SAC further alleged that the Posts falsely suggested that Gundersen was seeking an extramarital affair and made false depictions regarding Gundersen's sexuality and sexual orientation. (UF No. 23; Ex. 4 at 2, 19.)

34. The SAC alleged that Betenbaugh's conduct was motivated by a desire "to gain a competitive advantage in Glenn County's financial services market by sexually harassing, intimidating and defaming Dalas Gundersen, while Edward Jones' corporate attorneys and officers ratified such conduct in order to protect their employees and preserve their business opportunities in Glenn County." (UF No. 24; Ex. 4 at 3.)

35. The SAC also alleged that Gundersen "endured numerous explicit phone calls requesting sex as well as text messages seeking sexual encounters and depicting male genitalia." The SAC also alleged that Gundersen "constantly worried one of these men would show up at his home or office." The SAC also alleged that Gundersen "was forced to answer all calls coming into his phone and check all text messages because [Betenbaugh] had used Gundersen's work cell phone number as the contact for the Craigslist posts, and [Gundersen] could not risk missing a call

from a client or customer."  (UF No. 25; Ex. 4 at 7–8.)

36.    On November 4, 2016, Gundersen filed the Verified Third Amended Complaint (the "TAC") in the Underlying Action, naming Betenbaugh, Rodriguez, and Edward Jones as defendants.  (UF No. 26; Ex. 5.)

37.    The TAC asserts the following causes of action against Betenbaugh: (1) Internet Impersonation (Penal Code § 528.5); (2) Interference with Prospective Economic Relations; (3) Unfair Business Practice (Business & Professions Code § 17200); (4) False Light; (5) Defamation; and (6) Intentional Infliction of Emotional Distress.  (UF No. 27; Ex. 5.)

38.    The TAC describes the nature of the action as arising from Betenbaugh's and Rodriguez's conduct "to harass, intimidate and defame Dalas Gundersen, in an effort to injure Gundersen and to gain a competitive advantage in Glenn County's financial services market."  (UF No. 28; Ex. 5 at 2.)

39.    The TAC alleges that Betenbaugh impersonated Gundersen by posting the Posts and listing Gundersen's business cellular telephone number as a contact number. The TAC further alleges that the Posts falsely suggested that Gundersen was seeking an extramarital affair, and made false depictions regarding Gundersen's sexuality and sexual orientation.  (UF No. 29; Ex. 5 at 6, 13–14.)

40.    The TAC alleges that Betenbaugh posted the Post "to force Gundersen to cancel his work cell phone number, thereby making it more difficult for Gundersen to stay in contact with his former customers."  (UF No. 30; Ex. 5 at 7.)

41.    The TAC alleges that Gundersen was inundated with text messages depicting male genitalia and phone calls from men looking for sex in response to the Posts.  The TAC further alleges that "Gundersen worried constantly that one of these men would show up at this home or office."  The TAC also alleges that "Gundersen was forced to answer all calls to his work cellphone and to check all text messages because he could not risk missing a call from a client or customer."  (UF No. 31; Ex. 5 at 6–7.)  The Posts, without the graphic images, were attached as an exhibit

to and incorporated into the TAC.  (Ex. 5 at 18–20.)

42.    The TAC alleges that the Posts were timed to generate calls and text messages and lewd photos while Gundersen was attending a business meeting, in a concerted effort to harass Gundersen in front of business associates.  (Ex. 5 at 7.)

43.    As with the SAC, the TAC alleged that Betenbaugh knowingly impersonated Gundersen on the internet, without consent, by posting the Posts and suggesting that the Posts had, in fact, been posted by Gundersen, and further, that Betenbaugh intended his conduct to cause injury to Gundersen.  (Ex. 5 at 9.)

44.    On March 28, 2017, in answering the TAC, Betenbaugh admitted, under penalty of perjury, that "he, alone posted on Craigslist advertisements containing [Gundersen's] telephone number."  Betenbaugh further conceded that he "ha[d] admitted to making some of the Craigslist postings."  (UF No. 32; Ex. 6 at 2.)

45.    On April 3, 2017, Plaintiff transmitted to Betenbaugh a reservation of rights letter ("Reservation of Rights").  The Reservation of Rights stated, "[b]ased upon the Lawsuit and known facts, [Plaintiff] will provide a defense to [Betenbaugh] subject to this reservation of rights to deny insurance coverage, in whole or in part, at a later date as warranted."  (UF No. 36.)

46.    Plaintiff specifically reserved its right to deny coverage under the Umbrella Policy, asserting that (1) there was no "ultimate net loss" in excess of the "retained limit," (2) there was no covered loss caused by an "occurrence," (3) there was no "bodily injury," "property damage," or "personal injury," (4) coverage was excluded under the Umbrella Policy for "personal injury" that was caused by or at the direction of an insured with the knowledge that that act would violate the rights of another and would inflict "personal injury," (5) coverage was excluded under the Umbrella Policy for "personal injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity, (6) coverage was excluded under the Umbrella Policy for "bodily injury," "property damage," or "personal injury" arising out of "business" pursuits or "business"

11

property of any insured, (7) coverage was excluded under the Umbrella Policy for "bodily injury," "property damage," or "personal injury" arising out of any criminal act or omission committed by or with the knowledge and consent of any insured, except those violations of a motor vehicle law, (8) coverage was excluded under the Umbrella Policy for "bodily injury," "property damage," or "personal injury" arising out of sexual molestation, corporal punishment, sexual harassment or physical or mental abuse, and (9) to the extent that coverage is afforded by the Umbrella Policy, if at all, the Umbrella Policy provides excess coverage over any other insurance available to an insured.  Plaintiff also reserved the right to seek reimbursement from Betenbaugh of all defense costs incurred solely for the defense of claims that do not present the potential for coverage pursuant to *Buss v. Superior Court*, 16 Cal.4th 35 (1997).  (UF No. 37; Ex. 9 at 13–16.)

47.    The Reservation of Rights informed Betenbaugh of his right to independent counsel pursuant to California Civil Code § 2860.  (UF No. 38; Ex. 9 at 15–19.)

48.    The Reservation of Rights further stated, "[a]mong other things, [Plaintiff] reserve[s] the right to withdraw from [Betenbaugh's] defense in the event it is determined that [Plaintiff] ha[s] no obligation to defend [Betenbaugh] in this Lawsuit."  (UF No. 39; Ex. 9 at 16.)

49.    Plaintiff incurred defense fees and expenses in defending Betenbaugh in the Underlying Action.  (UF No. 43.)

<u>**CONCLUSIONS OF LAW**</u>

I.    <u>**LEGAL STANDARD**</u>

1.    Federal Rule of Civil Procedure ("Rule") 52(a)(1) states that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58."

2.    The Court must view all questions of fact and law at issue before it.  The Court

12

granted summary judgment for Plaintiff on its claims for declaratory relief that it had no duty to defend Betenbaugh under the Homeowners Policy and no duty to indemnify Betenbuagh under the Homeowners Policy or the Umbrella Policy but denied summary judgment on its claim for declaratory relief that it had no duty to defend Betenbaugh under the Umbrella Policy.  (ECF No. 40.)  The Ninth Circuit has held that denial of summary judgment does not bind the Court in any way to consider facts or law presented at trial.  *Fred Segal, LLC v. CormackHill, LP*, 821 F. App'x 783, 786 (9th Cir. 2020); *Burbank v. City of Idaho Falls*, 98 F.3d 1345 (9th Cir. 1996).  Put simply, "denial of a summary judgment motion is never law of the case." *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).  The Court is thus not bound to the arguments or facts presented before it at the summary judgment stage and will consider the claims and evidence put before it at trial.[7]

## II.    JURISDICTION/ VENUE

3.    The Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.  (ECF No. 1 at 2; ECF No. 14 at 2.)  "The amount in controversy is determined at the time of filing, and subsequent events that reduce this amount cannot destroy jurisdiction." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).  "Therefore, subsequent dismissal of certain claims or amendment of prayer for relief does not destroy jurisdiction if the Court was properly seized of jurisdiction in the first place." *Heichman v. AT&T*, 943 F. Supp. 1212, 1216–1217 (C.D. Cal. 1995).

4.    Venue is proper in the Eastern District of California because Defendants are located in this District, the events or omissions giving rise to the claims occurred in this District, and the subject insurance policy was delivered in this District.

---

[7]    As Plaintiff notes, Betenbaugh's Proposed Findings of Fact and Conclusions of Law raised arguments which were not previously raised in earlier motion practice, trial briefs, or during the trial.  The Court disregards any such arguments.

13

(ECF No. 1 at 2; ECF No. 14 at 2.)

### III.    DUTY TO DEFEND

5.    In determining whether the insurer owes a duty to defend, courts compare the allegations of the complaint and extrinsic evidence with the terms of the policy. *Maryland Cas. Co. v. Nat'l Am. Ins. Co. of Cal.*, 48 Cal. App. 4th 1822, 1829 (1996). "The absence of a duty to defend is established when the insurer shows that the underlying claim could not come within the policy coverage by virtue of the scope of the insuring clause or the breadth of an exclusion." *Total Call Internat. Inc. v. Peerless Ins. Co.*, 181 Cal. App. 4th 161, 167 (2010). Once an insurer determines there is no duty to defend, "the insurer does not have a continuing duty to investigate or monitor the lawsuit to see if the third party later made some new claim, not found in the original lawsuit." *Upper Deck Co. v. Fed. Ins. Co.*, 358 F.3d 608, 613 (9th Cir. 2004). Evidence that emerges after the insurer "has made an informed decision on coverage at the time of tender" is irrelevant and thus, inadmissible. *Am. States Ins. Co. v. Progressive Cas. Ins. Co.*, 180 Cal. App. 4th 18, 26 (2009).

6.    Here, the relevant documents for determining any potential duty to defend are the SAC and the TAC against Betenbaugh, as well as the extrinsic evidence consisting of Betenbaugh's Answer to the TAC, Betenbaugh's Recorded Statement, and his March 1, 2026 Declaration, which were before Plaintiff at the time it made its determination.

7.    The pleadings in the Underlying Action alleged that Betenbaugh was legally responsible for damages that potentially fell within the meaning of "personal injury" as defined by the Umbrella Policy, i.e., defamation of character.

8.    The Umbrella Policy does not apply to any "personal injury" caused by an insured "with knowledge that the act would violate the rights of another and would inflict personal injury" (the "Knowing Violation Exclusion"). (UF No. 55.) The Knowing Violation Exclusion bars coverage when an insured is deemed to know

14

that its intentional and willful conduct could cause personal injury. *Signal Prods. V. Am Zurich Ins. Co.*, No. 2:13-cv-04581-CAS, 2013 WL 6814847, at *19 (C.D. Cal. Dec. 19, 2013) (holding that where the insured's alleged liability arises out of "willful misconduct," the Knowing Violation Exclusion applies to bar coverage.)

9.   Indeed, the Knowing Violation Exclusion is effectively equivalent to the exclusion codified in California Insurance Code § 533 in that both exclude coverage for willful conduct and "are identical in scope." *Signal Prods.*, 2013 WL 6814847, at *20 (holding that the insured's willful misconduct triggered both the Knowing Violation Exclusion and Section 533 to bar coverage.)  This Court has already held that Section 533 applied to bar coverage for Betenbaugh's willful conduct when determining there was no potential for indemnity coverage under the Umbrella Policy.  (ECF No. 40 at 12.)  For the same reasons, the Court concludes that the Knowing Violation Exclusion, being "identical in scope" with Section 533, necessarily applies to preclude any potential defense coverage. *Burlington Ins. Co. v. Minadora Holdings, LLC*, 690 F. App'x 918, 922 (9th Cir. 2017).  On this basis alone, the Knowing Violation Exclusion applies to bar any potential coverage.

10.   Additionally, the facts and evidence demonstrate Betenbaugh's conduct, as alleged in the pleadings of the Underlying Action, fell squarely within the Knowing Violation Exclusion.  Specifically, both the SAC and the TAC provided that Betenbaugh willfully posted the Posts in order to harass, intimidate, and defame Gundersen and with specific intent to cause injury to Gundersen.  (UF Nos. 24, 28; Ex. 4 at 12; Ex. 5 at 9.)  In his Answer to the TAC, Betenbaugh admitted, under penalty of perjury, to willfully posting the Posts containing sexually-motivated solicitations and Gundersen's telephone number.  (UF No. 32.)

11.   The extrinsic facts before Plaintiff at the time of tender were in accord.  In his recorded statement, Betenbaugh stated that he willfully posted the Posts with Gundersen's phone number in order to harass Gundersen, and that he knew what

15

he did was wrong.  (Ex. 12 at 2.)  Thereafter, in his March 1, 2016 declaration, Betenbaugh attested that he willfully posted the Posts to harass Gundersen.  (UF No. 13; Ex. 13 at 2.)

12.   Thus, irrespective of Betenbaugh's description of his conduct as a "prank," and irrespective of whether Betenbaugh was negligent or not, it is undisputed that Betenbaugh intended to harass Gundersen.

13.   California courts have held that acts of harassment are willful acts for which coverage is necessarily excluded by Section 533.  *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal. App. 4th 1595, 1602 (1993); *see also Michaelian v. State Comp. Ins. Fund*, 50 Cal. App. 4th 1093, 1107 (1996) (finding no duty to defend a claim for negligent infliction of emotional distress where "the gravamen of the [underlying] complaint is conduct constituting sexual harassment in violation of public policy.")  The Knowing Violation Exclusion essentially adopts the statute's preclusion of coverage for willful acts and forecloses any duty to defend where the allegations and extrinsic facts trigger application of Section 533.  *Burlington Ins. Co.*, 690 F. App'x at 922.

14.   Separately, the Umbrella Policy does not apply to any "personal injury" arising out of "written publication of material, if done by or at the direction of an insured with knowledge of its falsity" ("False Publication Exclusion").  (UF No. 55.)

15.   The facts and evidence establish that Betenbaugh posted the Posts with knowledge of their falsity.  The SAC alleged that the Posts falsely suggested that Gundersen was seeking an extramarital affair and made false depictions regarding Gundersen's sexuality and sexual orientation.  (UF No. 23.)  The TAC asserted causes of action against Betenbaugh including: (1) Internet Impersonation; (2) False Light; and (3) Defamation.  (UF No. 27.)  Further, the TAC alleged that Betenbaugh impersonated Gundersen by posting the Posts and listing Gundersen's business cellular telephone number as a contact number.  (UF No. 29.)  The TAC further alleged that the Posts falsely suggested that Gundersen was seeking an

extramarital affair and made false depictions regarding Gundersen's sexuality and sexual orientation. (*Id.*) In his Answer to the TAC, Betenbaugh admitted, under penalty of perjury, that "he, alone, posted on Craigslist advertisements containing [Gundersen's] telephone number." (UF No. 32.)

16. As above, the extrinsic facts that were before Plaintiff at the time of tender were in accord. During his recorded statement, Betenbaugh stated that he understood what he did was wrong, but that he did not think that the Posts would be traced back to him. (Ex. 12 at 2.) During his recorded statement, Betenbaugh also stated that he posted the Posts with Gundersen's phone number in order to harass Gundersen. (*Id.*) Also, in his March 1, 2016 declaration, Betenbaugh admitted, under penalty of perjury, to knowingly posting the Posts with Gundersen's telephone number. (UF No. 12.)

17. It is undisputed that the Posts were false in that they: (1) falsely suggested that Gundersen, not Betenbaugh, posted the Posts; (2) falsely suggested that the Posts contained graphic portrayals of Gundersen's male genitalia; and (3) falsely suggested that Gundersen was soliciting sex. It is also undisputed that, at the time Betenbaugh posted the Post, he was aware that they contained false information and intended to harass Gundersen with the false statements.

18. Courts routinely find the False Publication Exclusion bars any potential for coverage when the insured was aware at the time of his publication of material that it was false. *See Mulberry Square Prods. v. State Farm Fire & Cas. Co.*, 101 F.3d 414, 423 (5th Cir. 1996); *Evanston Ins. Co. v. Clartre, Inc.*, 158 F. Supp. 3d 1110, 1123 (W.D. Wash. 2016); *Quad/Graphics, Inc. v. One2One Communs., L.L.C.*, No. 09-CV-99, 2011 WL 1871108, at *4 (E.D. Wis. May 16, 2011); *see also Grange Ins. Ass'n v. Roberts*, 177 Wash. App. 1021 (2013) (finding the False Publication Exclusion and the Knowing Violation Exclusion applied when the insured knew that her false statements would cause interference in the plaintiff's personal relationships, thus violating her rights).

17

19. Finally, the Umbrella Policy does not apply to any "personal injury" arising out of any business pursuits (the "Business Pursuits Exclusion").  (UF No. 55.)

20. Both the SAC and the TAC provided that Betenbaugh's action of posting the Posts arose out of business pursuits.  The SAC alleged that Betenbaugh's conduct was motivated by a desire "to gain a competitive advantage in Glenn County's financial services market by sexually harassing, intimidating and defaming Dalas Gundersen, while Edward Jones' corporate attorneys and officers ratified such conduct in order to protect their employees and preserve their business opportunities in Glenn County."  (UF No. 24; Ex. 4 at 3.)  Further, the TAC included claims for interference with prospective economic relations and unfair business practice.  (UF No. 27; Ex. 5.)  The TAC described the nature of the action as arising from Betenbaugh's and Rodriguez's conduct "to harass, intimidate and defame Dalas Gundersen, in an effort to injure Gundersen and to gain a competitive advantage in Glenn County's financial services market."  (UF No. 28; Ex. 5 at 2.)  The TAC alleged that Betenbaugh posted the Post "to force Gundersen to cancel his work cell phone number, thereby making it more difficult for Gundersen to stay in contact with his former customers."  (UF No. 30; Ex. 5 at 7.)  The TAC also alleged that the Posts were timed to generate calls and text messages and lewd photos while Gundersen was attending a business meeting, in a concerted effort to harass Gundersen in front of business associates.  (Ex. 5 at 7.)

21. Thus, the Business Pursuits Exclusion is a separate and independent basis supporting the determination that Plaintiff had no duty to defend Betenbaugh.[8]

## IV.   **DECLARATORY RELIEF**

22. The Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).

---

[8]   Upon finding Plaintiff had no duty to defend based on three separate and independent bases, the Court need not reach the question as to whether the Sexual Harassment Exclusion supports the determination that Plaintiff had no duty to defend Betenbaugh

23. By application of the exclusions discussed above, Plaintiff had no duty to defend the claims asserted against Betenbaugh under the Umbrella Policy, and thus, Plaintiff is entitled to judgment on its remaining claim.

## V.   CONCLUSION

24. Judgment will be entered in Plaintiff's favor consistent with this ruling.

25. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

**Date: July 1, 2026**

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE